AT&T CORP., Defendant Below, Appellant,

v.

Charles LILLIS, Gary Ames, Richard Post, Frank Eichler Robert Crandall, Lou Simpson, Pierson Grieve, Richard McCormick, Janice Peters, Pearre Williams, Roger Christensen, Doug Holmes, Steven Boyd, Patti Klinge, Connie Campbell, Sharon O'Leary, Jim Taucher, Bud Wonsiewicz and Daniel Yohannes, Plaintiffs Below, Appellees.

AT&T Corp., Defendant Below, Appellant,

v.

Charles Lillis, Gary Ames, Richard Post, Frank Eichler Robert Crandall, Lou Simpson, Pierson Grieve, Richard McCormick, Janice Peters, Pearre Williams, Roger Christensen, Doug Holmes, Steven Boyd, Patti Klinge, Connie Campbell, Sharon O'Leary, Jim Taucher, Bud Wonsiewicz and Daniel Yohannes, Plaintiffs Below, Appellees.

Charles Lillis, Gary Ames, Richard Post, Frank Eichler Robert Crandall, Lou Simpson, Pierson Grieve, Richard McCormick, Janice Peters, Pearre Williams, Roger Christensen, Doug Holmes, Steven Boyd, Patti Klinge, Connie Campbell, Sharon O'Leary, Jim Taucher, Bud Wonsiewicz and Daniel Yohannes, Plaintiffs Below, Appellees/Cross Appellants,

v.

New Cingular Wireless Services, Inc., f/k/a AT&T Wireless Services, Inc., Defendant Below, Cross Appellee.

Nos. 490, 2007, 459, 2007.

Supreme Court of Delaware.

Submitted: March 12, 2008.

243

A. Gilchrist Sparks, III (argued) and John P. DiTomo, Morris Nichols Arsht & Tunell LLP, Wilmington; Delaware; Todd Schiltz, Wolf Block Schorr and Solis–Cohen LLP, Wilmington, Delaware for Defendant Below, Appellant AT & T Corp.

Kevin Abrams and Nathan A. Cook, Abrams & Laster LLP, Wilmington, Delaware; Miranda S. Schiller (argued), Weil,

Gotshal & Manges LLP, New York, New York pro hac vice for plaintiffs/appellees/cross appellants.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the court en banc.

STEELE, Chief Justice.

Plaintiffs-appellees, who are former directors and officers of MediaOne Corp., seek compensation for stock options[1] that were cashed out in a 2004 merger between AT & T Wireless and Cingular. MediaOne originally granted its directors and officers options under a 1994 stock option plan. An anti-destruction, anti-dilution clause in that 1994 stock option plan preserved the option holders' "economic position" upon the happening of certain specified events, including a merger.

AT & T acquired MediaOne in a stock for stock merger in 1999. In that merger, plaintiffs-appellees' MediaOne options were converted into AT & T options and continued to be governed by the terms of the 1994 MediaOne plan.

In 2001, AT & T spun off Wireless. In that transaction, *all* AT & T options holders, including plaintiffs-appellees, received new options in Wireless. An Employee Benefits Agreement and Wireless Adjust-ment Agreement governed the new Wireless options created through the spin off. In addition to those two agreements, the 1994 MediaOne stock option plan also continued to govern *plaintiffs-appellees'* new options in Wireless.

In 2004, Cingular agreed to a cash out merger with Wireless. In that transaction, which gave rise to this dispute, Wireless options holders were cashed out at $15 per share minus the exercise price of the option.

The plaintiffs-appellees who originally received options in MediaOne that were converted into Wireless options as a result of the foregoing transaction filed a complaint in the Court of Chancery against defendant-appellant AT & T and defendant-cross appellee Cingular. The plaintiffs claimed that Wireless (now Cingular) violated the terms of the 1994 plan when it cashed out plaintiffs-appellees' Wireless options without any compensation for the lost "time value" of their options.[2] Plaintiffs-appellees argued, in the alternative, that AT & T is liable for any breach of the 1994 plan by Wireless because AT & T had a duty to obligate Wireless legally to observe those terms.

In a letter to plaintiffs' counsel and in its answer to the complaint, AT & T initially took the position that Wireless could not cash out *any* Wireless options[3] based on

1. An option is a right to purchase a stock at a given price. For instance, an option may be granted to purchase stock at $10 per share—this is known as the *exercise price*. After an option is granted, the price of the underlying stock may vary. In this example, if the price increases to $11 per share, the option is called an *in-the-money* option because, if the holder exercises the option, he can purchase the underlying stock for $10 per share and immediately sell it for $11 per share and he profits by $1 per share. On the other hand, when the stock price falls to $9 per share, the option is called an *out-of-the-money* option.

2. The value of an option has two components: (i) intrinsic value, which is the market value of the option at any specific moment in time; and, (ii) time value, which is the value attributable to the option's potential to appreciate in the future. The 2004 Cingular–Wireless merger resulted in the plaintiffs-appellants' options being "cashed out" for their intrinsic value ($15 less the option exercise price), without any additional consideration being paid for the options' time value.

3. The Wireless Adjustment Plan refers to "Adjusted Options." When AT & T spun off Wireless, *all* AT & T options holders were granted new options in the newly formed Wireless.

AT & T's understanding of the Employee Benefits Plan and the Wireless Adjustment Plan, which governed *all* Wireless options created in the 2005 spin off. In order to bind Wireless to its contractual duties as AT & T saw them, AT & T arbitrated its dispute with Wireless. After a hearing, the arbitration panel found that Wireless did not breach either of those plans. AT & T then changed litigation strategy in the Court of Chancery, by asserting that the 1994 plan did not proscribe Wireless from cashing out the options. Although AT & T acknowledged that the 1994 plan required AT & T to preserve plaintiffs-appellees' "economic position" "immediately prior" to a merger, it argued that in the context of a cash out merger, plaintiffs-appellees' "economic position" was limited to the intrinsic value of the options.

A Vice Chancellor denied cross motions for summary judgment, holding that Section XVIII.A of the 1994 plan controlled the plaintiffs-appellees' options,[4] but that the term "economic position" in that section was ambiguous. The Vice Chancellor then held a trial to consider extrinsic evidence that could aid him in interpreting that term.

Interpreting Section XVIII.A., the Vice Chancellor noted AT & T's initial position that Wireless could not cancel the stock options and accorded "great weight" to AT & T's initial stance. The Vice Chancellor also found that the parties' earlier transactions, where stock options were replaced with new stock options, demonstrated that the parties intended to preserve the time value of the options in each transaction. Because Wireless did not preserve the time value of the options in the 2004 merger, he found AT & T liable for a breach of the 1994 plan. The Vice Chancellor further found that AT & T had not transferred the 1994 MediaOne plan's obligation to Wireless and, thus, did not hold Cingular liable.

On appeal, we uphold the Vice Chancellor's conclusion that the term "economic position" is ambiguous because both plaintiffs-appellees and AT & T present reasonable interpretations of Section XVIII.A. On the one hand, the phrase "economic position" of a stock option is broad enough to encompass the prospect that its worth will increase over time, *i.e.* time value. On the other hand, in a cash out merger, option holders would expect to receive only a fixed cash sum when the merger becomes effective. In that context, the "economic position" of the options would not include any future value since the options will no longer exist. Instead that term would only incorporates the right to receive the options' intrinsic value.

To resolve that ambiguity, we must consider what the extrinsic evidence shows the term "economic position" was intended to mean in the context of a cash out merger. The Vice Chancellor concluded that that term was intended to encompass the time value of the options in any merger, including a cash out merger. Having reviewed the Vice Chancellor's opinion, we conclude: (1) that he declined to address the difference between a cash out merger and a stock for stock merger for purposes of interpreting "economic position;" and, (2) that he declined to consider the importance of the $85 cash election in the Me-

Thus, the term Adjusted Options refers to *all* options created at the time of the Wireless spin off, including but not limited to plaintiffs-appellees' options.

4. There are three written opinions in this case. *Lillis v. AT&T Corp.*, 896 A.2d 871 (Del.Ch.2005); *Lillis v. AT & T Corp.*, 904 A.2d 325 (Del.Ch.2006); *Lillis v. AT&T Corp.*, Del.Ch., C.A. No 717, Mem. Op., 2007 WL 2110587 (July 20, 2007).

diaOne–AT & T merger. Because we believe the cash election in the MediaOne–AT & T merger most closely resembles the cash out merger here, we **REMAND** the case for the Vice Chancellor to address fully the significance of (i) the distinction between a stock merger and a cash out merger; and, (ii) the $85 cash election in the AT & T–MediaOne transaction, in deciding what the contracting parties intended by their use of the term "economic position."

We also find that the Vice Chancellor should not have given any evidentiary weight to AT & T's supposed admission because those supposed admissions did not relate to the interpretation of the 1994 plan. Thus, the Vice Chancellor should not afford AT & T's supposed admissions any weight on remand.

### FACTS AND PROCEDURAL HISTORY

Plaintiffs-appellees are former officers and directors of MediaOne Corp. MediaOne adopted a stock option plan in 1994 and granted stock options to plaintiffs-appellees. Section XVIII.A of the 1994 plan protects plaintiffs-appellees' options through an anti-destruction, anti-dilution provision. That Section reads:

In the event there is any change in the Common Stock by reason of any consolidation, combination, liquidation, reorganization, recapitalization, stock dividend, split-up, split-off, spin-off, combination of shares, exchange of shares or other like change in capital structure of the [MediaOne], the number or kind of shares or interests subject to an Award and the per share price or value thereof shall be appropriately adjusted by the

Committee at the time of such event, provided that each Participant's *economic position* with respect to the Award shall not, as a result of such adjustment, *be worse than it had been immediately prior to such event.* [emphasis added]

In 1999, AT & T entered into merger discussions with MediaOne, and agreed to purchase MediaOne for a fixed ratio of AT & T's stock, *or* $85 per share, *or* a combination of cash and stock. In these negotiations, AT & T agreed to convert plaintiffs-appellees' MediaOne options into AT & T options that would be governed by the terms of the 1994 MediaOne plan. In that merger, option holders had three alternatives: (1) they could convert all of their MediaOne options into AT & T options; (2) they could cash out all of their options at $85 per share minus the option's exercise price; or (3) they could receive a combination of new options and cash.[5]

After AT & T acquired MediaOne, AT & T completed three transactions that required adjustments to plaintiffs-appellees' options as prescribed by Section XVIII.A of the 1994 plan. In 2001, AT & T spun-off the wireless portion of its business and created AT & T Wireless Services, Inc., with Wireless having its own stock. AT & T also sold its cable business to Comcast. Finally, SBC acquired AT & T and renamed the combined company AT & T. In each of these transactions, plaintiffs-appellees received options in the new surviving entity's shares.

When AT & T spun-off Wireless, AT & T converted a part of AT & T's stock options into options to purchase the new Wireless stock.[6] Thus, after the spin-off, option holders, including plaintiffs-appel-

---

5. On appeal, plaintiffs-appellees claim that no option holder took the cash election. In fact, the record before us is silent on that issue. Even if that was so, that does not negate the

fact that the cash out alternative existed and that it mirrored the cash out for shareholders.

6. Known as "Adjusted Options" in the parlance of the Wireless Adjustment Plan.

lees, held options in both AT & T and Wireless. The new Wireless options were governed by two different agreements, an Employee Benefits Agreement and the AT & T Wireless Services Adjustment Plan.

For several years, Wireless operated independently with its own issued stock. Eventually in 2004, Cingular Wireless acquired Wireless through a merger for $15 per share. In that merger agreement, Wireless's shares were cancelled and converted into a right to receive $15 cash. Similarly, stock options with an exercise price of less than $15 per share, *i.e.* in-the-money options, were cancelled and exchanged for the right to receive $15 cash minus the exercise price. Wireless and Cingular agreed that they would not cancel the out-of-the-money options (those options with exercise prices greater than $15 per share). Even though the out-of-the-money options were never cancelled, they were nonetheless worthless.

In September 2004, plaintiffs-appellees filed a complaint in the Court of Chancery. Plaintiffs-appellees claimed that the 1994 plan governed their Wireless options independent from the Wireless Adjustment Agreement and the Employee Benefits Agreement. Based on their interpretation of Section XVIII.A, plaintiffs-appellees contended that Wireless had wrongfully failed to preserve the "full economic value" of the stock options because the merger cashed out the options and did not grant plaintiffs-appellees new stock options in Cingular after the merger. Plaintiffs-appellees also argued that, even if Wireless were not legally bound to observe Section XVIII.A, AT & T was bound. Because AT & T was obligated to ensure in the merger agreement that Section XVIII.A applied to Wireless, AT & T was liable for any dam-

ages resulting from Wireless's breach of the plan.

Based on AT & T's understanding of the Employee Benefits Plan and the Wireless Adjustment Plan, AT & T took the position that Wireless could not cash out options on Wireless stock. In its answer and in a related arbitration between AT & T and Wireless, AT & T contended that Wireless was obligated to preserve the time value of the options. By taking this position, AT & T sought to protect the value of *all* former AT & T option holders, including but not limited to plaintiffs-appellees.

Similarly, in a letter from AT & T's counsel to plaintiffs-appellees' counsel, AT & T wrote that "[t]he Employee Benefits Agreement and the Adjustment Plan (i) prevent Wireless from canceling the Adjusted Options prior to expiration, and (ii) require Wireless, in the event of any merger, to make such adjustments and other substitutions to the Adjusted Options as shall protect your clients' 'economic rights' in their options."[7] Notably, AT & T's counsel did not base their letter on their reading of Section XVIII.A of the 1994 plan. Instead they referred only to the documents created when AT & T spun-off Wireless, *i.e.* the Employee Benefits Agreement and the Wireless Adjustment Plan.

To enforce Wireless's contractual obligation under the Employee Benefits Plan and Wireless Adjustment Plan, AT & T proceeded with a separate arbitration against Wireless. The arbitration panel ruled, however, that Wireless had met its obligations under both plans and that Wireless was not required to issue new options in lieu of the cash out. Thus, Wireless had no contractual obligation to

---

7. Adjusted Options refers to Wireless options created at the time of the AT & T and Wireless spin-off.

preserve the time value of the out-of-the-money options granted by either AT & T or Wireless.

As a result of this arbitration decision, AT & T changed its litigation strategy because Wireless now faced no liability for having canceled the options. AT & T, perhaps optimistically, believed it would avoid any liability to the plaintiffs-appellees in this action because of the favorable ruling in the arbitration. Once it was established that the Employee Benefits Plan and the Wireless Adjustment Plan allowed Wireless to cash out options, AT & T argued that it was not liable for a breach of Section XVIII.A because the 1994 plan did not govern plaintiffs-appellees' options and because AT & T had no contractual duty to bind Wireless to the terms of Section XVIII.A. Alternatively, AT & T argued that Section XVIII.A permitted Wireless to cash out the options for intrinsic value. To pursue its new litigation strategy, AT & T sought to amend its Chancery answer and thereby withdraw some of its admissions made in response to plaintiffs-appellees' complaint.

AT & T, however, did not need to amend its answer to plaintiffs-appellees' alleged legal interpretation of Section XVIII.A. In paragraph 17 of their Chancery complaint, plaintiffs-appellees' alleged:

> The 1994 Plan provides that 'in the event there is any change in the [MediaOne] Common Stock by reason of any consolidation, combination, ... recapitalization, ... split-off, spin-off, combination of shares, exchange of shares or other like change in capital structure of the Company, the number or kind of shares or interest subject to an Award and the per share price or value thereof shall be appropriately adjusted by the Committee at the time of such event,

> provided that each Participant's economic position with respect to the Award shall not, as a result of such adjustment, be worse than it had been immediately prior to such event.' Id. at ¶ XVIII(A) (emphasis added). This means that in the event MediaOne is acquired in a merger, Plaintiffs' economic position with respect to the Options shall be maintained and the Options shall be appropriately adjusted to ensure that Plaintiffs receive securities of an equivalent value.[8]

AT & T's answer properly stated that either no response was needed because the 1994 plan was a document which spoke for itself or a conclusion of law, and to the extent a response was required, AT & T denied the allegations.

Plaintiffs-appellees moved for judgment on the pleadings based, in large part, on earlier AT & T admissions, arguing that any admissions in the answer constituted binding judicial admissions. The Vice Chancellor correctly noted that AT & T's admissions were not binding judicial admissions. In a footnote, he recognized that:

> judicial admissions apply only to admissions of fact, not to theories of law, such as contract interpretation. Moreover, AT & T is not barred from changing its position under the doctrine of judicial estoppel because this court did not rely on AT & T's argument in a decision.[9]

Granting AT & T's motion to amend its pleadings and denying plaintiff-appellees' motion for judgment on the pleadings, the Vice Chancellor wrote:

> While the court concludes that it should grant AT & T's motion to amend, it will not do so unconditionally. In its answer and its brief in opposition to the Rule

---

8. Emphasis in original.

9. *Lillis,* 896 A.2d at 877 (citations omitted).

12(c) motion, AT & T made an irrefutably deliberate choice to admit the substance of the plaintiffs' claim (including adopting the plaintiffs' interpretation of the 1994 Plan) but pointed the finger at Wireless as the party obligated to make the plaintiffs whole. Based on AT & T's numerous admissions, the plaintiffs made a good faith decision that they were entitled to judgment on the pleadings and moved for such under Rule 12(c). They, undoubtedly, incurred substantial expense in briefing and arguing that motion. That effort and expense will be largely wasted if AT & T is allowed to amend its answer.

A conditional allowance is within the court's discretion under Rule 15. In exercising that discretion, the court concludes that the plaintiffs should not be forced to bear the cost of AT & T's procedural maneuvering. Therefore, the proper outcome is to grant AT & T leave to amend its answer, conditional upon AT & T paying the reasonable legal fees and costs that the plaintiffs incurred in bringing their Rule 12(c) motion.

After AT & T amended its answer, both sides moved for summary judgment. The Vice Chancellor denied both motions and held a four day trial. After trial, the Vice Chancellor resolved several issues, only one of which is the subject of AT & T's appeal here.

In his post-trial opinion, the Vice Chancellor determined that AT & T was re-quired, but failed, to obligate Wireless to the terms of the 1994 stock-option plan when it spun-off Wireless.[10] Accordingly, AT & T would be liable for Wireless's breach, if any, of the 1994 plan. AT & T did not appeal this holding.[11]

AT & T did appeal the Vice Chancellor's interpretation of Section XVIII.A.[12] The plaintiffs-appellees contended in Chancery that Section XVIII.A preserves the "economic position" of their Wireless options, and that "economic position" *unambiguously* meant the *full* economic value of the options, which included *both* the *intrinsic value and* the *time value* of the options. In particular they argued that the $15 per share cash out foreclosed the possibility of any future gains in the stock price. In order to preserve their "economic position" and thus "full economic value," they contended that either: (1) Wireless should have issued to them new options to purchase Cingular stock or (2) they should have received a higher cash pay out to compensate them for the lost opportunity to reap future gains. In the alternative, plaintiffs-appellees contended that, if the Vice Chancellor decided that the term "economic position" was ambiguous, extrinsic evidence and the parties' course of conduct supported their interpretation.

On the other hand, AT & T contended that plaintiffs-appellees' "economic position" "immediately prior to" the merger was preserved because the merger proceeds only provided $15 cash per share.

---

**10.** *Lillis*, Del.Ch., C.A. No 717, Mem. Op. at 28–30, 2007 WL 2110587 (July 20, 2007).

**11.** Plaintiffs-appellees cross-appealed arguing that, in the alternative, we could find Wireless liable for a breach of the 1994 plan. However, this cross-appeal is moot because the only issue that AT & T appealed was whether Wireless breached the terms of the 1994 plan. If Wireless never breached the 1994 plan, then neither AT & T nor Wireless would be liable.

If Wireless did breach the plan, AT & T is liable for that breach and we need not reach any alternative basis to find liability.

**12.** AT & T also appealed the Vice Chancellor's calculation of damages. Because this opinion remands for consideration of AT & T's initial liability, we do not address the issue of damages.

More specifically, Wireless needed to do no more than protect the "economic position" of the options "immediately prior to" the merger, which in this case consisted solely of the right to receive $15 cash per share minus the exercise price of options that were "in the money." Out-of-the-money options, however, were worthless because the underlying stock would be cashed out at a price less than the exercise price. Thus, for out-of-the-money options, there was no future value subsumed within the terms "economic position ... immediately prior to [the merger]" to preserve.

The Vice Chancellor concluded that the term "economic position" in Section XVIII.A was ambiguous.[13] He found that the term was not one of art and that this provision "may be *sui generis* in the use of the term 'economic position....' "[14] Because he found "economic position" to be the operative term in the paragraph in which it appears, the entire paragraph was ambiguous.[15] Thus, the Vice Chancellor admitted extrinsic evidence to help him determine the meaning of the entire paragraph.

The Vice Chancellor found that the extrinsic evidence supported the plaintiffs-appellees' interpretation of Section XVIII.A for several reasons.

First, he considered other adjustments to the options made in earlier transactions—*i.e.* the AT & T–MediaOne merger, the 2001 Wireless spin off, AT & T's cable assets sale to Comcast, and SBC's acquisition of AT & T.[16] The Vice Chancellor found that "[a]ll of these adjustments were made in the same way: the existing options were replaced with options in the new entity based on the positive or negative intrinsic value of the old options and new options."[17] Thus,

in this process, even out-of-the-money options, with negative intrinsic value, were replaced with new out-of-the-money options having equivalent negative intrinsic value, thus maintaining the time value of those options and, therefore, the plaintiffs' economic position.[18]

He noted that, in the AT & T–MediaOne merger, "both stockholders and option holders elected whether to receive cash, new securities, or a combination. This discussion here focuses on the adjustment calculated for those persons who elected to receive adjusted AT & T options."[19]

An important fact that the Vice Chancellor did not consider in his written analysis was that in the MediaOne–AT & T merger, both stockholders and option holders could elect to receive $85 (or $85 minus the exercise price) in cash rather receive the new stock (or options). In our view, that

13. *Lillis*, Del.Ch., C.A. No 717, Mem. Op. at 40.

14. *Id.*

15. *Id.*

16. *Id.* at 41–42.

17. *Id.* at 42.

18. *Id.*

19. *Id.* at 41. The Vice Chancellor's Opinion does not expressly interpret Section XVIII.A

of the 1994 Agreement to mandate that, in any future cash out merger, plaintiffs-appellees and other option holders in their class must be offered alternatives that would preserve the time value of their to-be-cashed-out options, namely: (i) options in the merged entity or an incremental increase in the cash-out price that specifically incorporates the time value of the options. If that is the interpretation that drove the analysis in the Opinion, it is not apparent from the text of the Opinion. For that reasons (and others), we have decided to remand the case to clarify whether or not this interpretation was intended, and if so, its application to the specific transaction at issue here.

cash alternative is significant to interpreting the intended meaning of the term "economic position." [20]

Second, the Vice Chancellor considered the extrinsic evidence that these executives and directors took a large portion of their compensation in the form of stock options.[21] Thus, he concluded, although not requiring a particular reading of the stock option plan, that fact "[made] it more likely that the terms of the 1994 Plan and the related agreements were designed to be more than usually protective of the economic interests of the option holders." [22]

Finally the Vice Chancellor found:

More significant, however, in resolving the ambiguity in the phrase 'economic position' is the fact that AT & T, the entity contractually bound to perform the 1994 Plan, wholeheartedly agreed with the plaintiffs' interpretation. That agreement is evidenced both in the April 9, 2004 letter from Fulbright & Jaworski to Weil Gotshal & Manges, and in AT & T's December 8, 2004 answer to the complaint in this action. While AT & T is not strictly bound by the positions taken in the later withdrawn answer, the court is entitled to consider both the letter and that answer and to give them great weight in reaching a decision.[23]

When considering this evidence, the Vice Chancellor noted:

This is a long established principle of law. *See, e.g., Sayre v. Mohney,* [35 Or. 141] 56 P. 526, 528 (Or.1899) (" 'Admissions made in pleadings will bind the party in the suit in which they are filed, though such pleadings have been stricken out or withdrawn.' Upon principle, such pleading must be admissible in evidence, for, if a party makes an oral declaration against his interest, it will be received in evidence, as tending to defeat a right which he attempts to assert in an action or suit in which the admission becomes material; and, such being the case, an original pleading, when verified, as in the case at bar, must, when superseded by an amendment, also be admissible for like reasons.") (quoting 1 Am. & Eng.Enc.Law (2d ed.) 719).[24]

Having considered the extrinsic evidence, the Vice Chancellor determined that the ambiguous term, "economic position," meant "full economic value." [25] Because plaintiffs-appellees only received the intrinsic value of their options at $15 per share, he held "[p]lainly, this adjustment process was not undertaken with a view to preserving each 'Participant's economic position with respect to the Award,' as contemplated by the 1994 Plan." [26]

The Vice Chancellor calculated damages and entered judgment against AT & T for $11,306,986, plus prejudgment interest.

## *DISCUSSION*

### I. *INTERPRETATION OF SECTION XVIII.A*

The first issue—the meaning of "economic position" as found in Section XVIII.A—requires us to consider the language of that section. Because this "involve[s] the interpretation of contract lan-

---

**20.** The record before us does not reflect whether any option holders sought cash that reflected both $85 intrinsic value plus a time value component of $X or even inquired if such an alternative was available.

**21.** *Id.* at 43.

**22.** *Id.*

**23.** *Id.* at 44.

**24.** *Id.*

**25.** *Id.* at 45.

**26.** *Id.* at 46.

guage, [it is a] question of law that this Court reviews *de novo* for legal error."[27] But,

> [t]o the extent the trial court's interpretation of the contract rests upon findings extrinsic to the contract, or upon inferences drawn from those findings, our review requires us to defer to the trial court's findings, unless the findings are not supported by the record or unless the inferences drawn from those findings are not the product of an orderly or logical deductive reasoning process.[28]

█ In his opinion, the Vice Chancellor interpreted Section XVIII.A under Delaware law. In their brief on appeal, however, plaintiffs-appellees argue that "Colorado law governs the 1994 Plan."[29] The plaintiffs-appellees never raised this argument before the Vice Chancellor. Indeed, in their briefs to the Vice Chancellor, plaintiffs-appellees cited extensively to Delaware contract law. Under Supreme Court Rule 8, "only questions fairly presented to the trial court may be presented for review," unless the interest of justice requires its consideration. Accordingly, plaintiffs-appellees have waived the argument that Colorado law governs the dispute, and we interpret the contract according to Delaware law.

█ Under Delaware law, "when interpreting a contract, the role of a court is to effectuate the parties' intent. In doing so, we are constrained by a combination of the parties' words and the plain meaning of those words where no special meaning is intended."[30]

> Clear and unambiguous language ... should be given its ordinary and usual meaning. Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it. When the language of a ... contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented....
>
> A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. Ambiguity does not exist where a court can determine the meaning of a contract without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends. Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty. The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position

---

**27.** *Honeywell Int'l Inc. v. Air Prods. & Chem., Inc.*, 872 A.2d 944, 950 (Del.2005).

**28.** *Id.*

**29.** Plaintiffs-appellees cite a Colorado case which states "in deciding whether a contract is ambiguous, a court 'may consider extrinsic evidence bearing upon the meaning of the written terms, such as evidence of local usage and of the circumstances surrounding the making of the contract.' " *Cheyenne Mountain Sch. v. Thompson*, 861 P.2d 711, 715 (Colo.1993) (citations omitted). This, of course, departs from the Delaware rule that only permits extrinsic evidence after finding a contract ambiguous. *See Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del.2006).

**30.** *Lorillard*, 903 A.2d at 739 (citing *Northwestern Nat'l Ins. Co. v. Esmark, Inc.*, 672 A.2d 41, 43 (Del.1996)).

of the parties would have thought it meant.[31]

However, "[i]f there is more than one reasonable interpretation of a disputed contract term, consideration of extrinsic evidence is required to determine the meanings the parties intended." [32]

 The Vice Chancellor found the term "economic position" in Section XVIII.A to be ambiguous. He reasoned that the "[e]vidence at trial, including searches of SEC filings databases, showed that neither side could find another agreement that used the term 'economic position.' " [33] Therefore, because the term economic position "may be *sui generis* . . . [t]he court is left to infer the meaning of 'economic position' from extrinsic evidence." [34]

We note that, in previous cases involving other contracts, Delaware courts have found other terms, undefined by the contract and undefined under Delaware law, to be unambiguous. In *Monsanto Co. v. Aetna Cas. & Sur. Co.*, the trial judge interpreted the term "suit" in an insurance contract. The dispute focused on whether "suit" included "administrative proceeding and claims." [35] The parties offered competing dictionary definitions of "suit" and various legal authorities supporting their respective definitions.[36] Rather than resorting to extrinsic evidence, the trial judge used reasoned judgment to determine that Monsanto's interpretation was not supported by its own proffered dictionary text, and accepted defendant's definition because it comported with the Eighth Circuit Court of Appeals definition of "suit." [37]

Similarly in *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, the parties disputed the term "sudden" in an insurance policy.[38] There, the trial judge specifically found that the term "sudden" unambiguously meant "abrupt" rather than "unexpected," despite conflicting support for each respective definition.[39] "Accordingly, I will consider the language of the exclusion within the context of the entire policy without resorting to conflicting dictionary definitions, inapposite treatise definitions, judicial disagreement or drafting history." [40]

Our task on *de novo* review, then, is to determine "what a reasonable person in the position of the parties would have thought" the term "economic position" meant.[41] Plaintiffs-appellees assert that "economic position" means "full economic value." Plaintiffs-appellees maintain that, in this context, "full economic value" means that the options' time value must be preserved. On the other hand, AT & T contends that "economic position" simply

**31.** *Id.* (quoting *Rhone–Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1195–96 (Del.1992)).

**32.** *Appriva S'holder Litig. Co., LLC v. ev3, Inc.*, 937 A.2d 1275, 1291 (Del.2007).

**33.** *Lillis*, Del.Ch., C.A. No 717, Mem. Op. at 40, 2007 WL 2110587 (July 20, 2007).

**34.** *Id.*

**35.** 1994 WL 161948, at *2, 1994 Del.Super. LEXIS 172, at *9 (1994). Although decided under Missouri law, Missouri law comports with Delaware law "require[ing] contractual terms be given their plain and ordinary meaning, absent a specific definition provided in the contract." *Id.*

**36.** *Id.* at *2–3, 1994 Del.Super. LEXIS 172, at *10.

**37.** *Id.* at *4, 1994 Del.Super. LEXIS 172, at *15.

**38.** 711 A.2d 45 (Del.Super.1995).

**39.** *Id.* at 58.

**40.** *Id.* at 60.

**41.** *See Rhone–Poulenc*, 616 A.2d at 1196.

refers to the "intrinsic value" of the options "immediately prior to" a cash out merger.

The language of Section XVIII.A protects the "economic position" of plaintiffs-appellees' options "immediately prior" to a merger. The important question, here, is: what exactly was plaintiffs-appellees' "economic position" in the face of an impending cash out merger?

On the one hand, a stock option's worth can increase substantially over time. It therefore is logical that the "economic position" of the stock option *might* include time value. On the other hand, at the point of time "immediately prior" to a cash out merger, the "economic position" of the stock options retains no time value because the options will be immediately exchanged for the right to receive a cash sum. In light of the impending cash out merger, there is no prospect that the option will ever be worth anything more than that exact cash sum. Thus, the "economic position" of the stock option might relate only to the cash sum for which the option will be exchanged.

We find both interpretations of Section XVIII.A to be reasonable. Therefore, the Vice Chancellor appropriately found the term "economic position" to be ambiguous and properly considered extrinsic evidence.

## II. Extrinsic Evidence

Plaintiffs-appellees urge us to find that the 1994 plan required AT & T and Wireless to preserve the time value of their options based upon AT & T's course of conduct and AT & T's alleged admissions. The Vice Chancellor considered three items of extrinsic evidence to find that the term "economic position" included the time value of plaintiffs-appellees' stock options. First, he considered the parties' course of conduct in earlier transactions. Second,

he looked to the fact that MediaOne's officers and directors received a significant proportion of their compensation through options. Finally, he gave "great weight" to AT & T's supposed admissions.

### A. *The Parties' Course of Conduct*

Plaintiffs-appellees suggest, and the Vice Chancellor accepted, that AT & T's course of conduct established AT & T's belief that the options' time value was required to be preserved—a course of conduct arguably supporting the parties' intended meaning of the term "economic position." But, plaintiffs-appellees and the Vice Chancellor spent no time discussing the fact that, in each of the previous transactions, the transactions were stock for stock transactions—not cash outs. When reviewing the MediaOne–AT & T merger, the Vice Chancellor noted "[t]his discussion here focuses on the adjustment calculated for those persons who elected to receive adjusted AT & T options." The Vice Chancellor never explained why he disregarded the cash election in that merger, nor did he address why the stock for stock election better evidenced the parties' intent in the context of the dispute in this case—a cash out merger.

In the transactions the Vice Chancellor considered, AT & T replaced plaintiffs-appellees' options to buy stock in the pre-merger company with options to buy post-merger stock. AT & T argues that "these prior events demonstrate that options were adjusted consistently to mirror adjustments to the underlying security." But these transactions were also distinguishable from the Cingular–Wireless merger precisely because they were stock for stock transactions. Therefore, they did not necessarily evidence what the parties intended to occur in a cash out merger. In the case of a stock for stock merger, option holders expect to have their old

options replaced with new options because the old (underlying) stock is being replaced with new (underlying) stock. In such a transaction, by its very nature, the "economic position" of the options will invariably incorporate the expected time value of the new options.

But where the stock and the options are to be cashed out in a merger, the option holders can have no expectation of receiving replacement options in new stock. Instead, option holders will, and expect to, receive only cash representing intrinsic value for their options. The question presented in this case is whether, in order to protect option holders' "economic position," the option holders must receive additional compensation where they receive cash and not stock. The cash election in the MediaOne–AT & T merger is the only earlier transaction that included a cash component. It, therefore, is the only transaction similar to the one at issue here.

In the MediaOne–AT & T merger, shareholders and option holders could elect to receive (1) cash, (2) new stock or (in the case of option holders) new options, or (3) a combination of both cash and stock (or options). Stockholders electing cash would receive $85 per share, and the option holder would receive $85 per share minus the exercise price of the options. Under plaintiffs-appellees' interpretation of Section XVIII.A, option holders in the MediaOne–AT & T merger should have received additional compensation above the cash out for $85 per share in order to compensate option holders for the lost time value. Yet, in that merger, option holders who might have chosen the cash out would have received intrinsic value

*only.* They would not have received additional compensation for the time value of the options. Logically, option holders in that merger electing cash would have received the intrinsic value, $85, cash only, because those who wished to preserve time value would have elected the offered options designed to preserve time value in the surviving entity.

■ Because the Vice Chancellor did not address the distinction between a cash out merger and a stock for stock merger and the significance of that distinction in evaluating the extrinsic evidence of contractual intent, we remand this case for him to reconsider the evidentiary importance of the parties' course of conduct in the MediaOne–AT & T transaction.

B. *AT & T's Admissions*

We also are constrained to comment on the "great weight" that the Vice Chancellor afforded to AT & T's supposed admissions. The Vice Chancellor found (1) AT & T's admissions in its answer and (2) the letter sent from AT & T's counsel to plaintiffs-appellees' counsel to be persuasive evidence that AT & T, in fact, believed that it needed to preserve the time value of plaintiffs-appellees' options under the 1994 plan.[42] We find, however, that AT & T's letter to plaintiffs-appellees admitted nothing relating to the parties' intended meaning of the phrase "economic position" in Section XVIII.A. Moreover, AT & T consistently denied plaintiffs-appellees' interpretation of Section XVIII.A.

Having reviewed AT & T's alleged admission in its letter, we conclude that that letter does not refer to the 1994 plan at all.[43] Rather, the letter refers to the Em-

---

**42.** *Lillis,* Del.Ch., C.A. No 717, Mem. Op. at 43–44.

**43.** When AT & T used the term Adjusted Options in the letter, it used a defined term in

the Wireless Adjustment Plan. Adjusted Options simply referred to those options in Wireless that were created when AT & T spun off Wireless. Of course Wireless, itself, could

ployee Benefit Agreement and the Adjustment Plan—separate documents that were created when AT & T spun off Wireless.[44] AT & T's spin off of Wireless preserved *all* AT & T's options holders' rights by issuing options to acquire the new Wireless stock. To protect *all* of *these* options in the future, AT & T obligated Wireless under the Employee Benefits Agreement and the Wireless Adjustment Plan. When it wrote plaintiffs-appellees' counsel, AT & T explained that it, too, was concerned that Wireless had cashed out *all* options holders at $15 per share minus the exercise price. AT & T asserted that the Employee Benefits Agreement and the Wireless Adjustment Plan prevented Wireless from cashing out *any* options. AT & T spoke in order to protect the interests of *all* Wireless options created by the spin off, which of course included—but was not limited to—options held by plaintiffs-appellees. Because AT & T was attempting to protect *all* former AT & T (and now Wireless) options holders, AT & T did not refer to the 1994 plan or to Section XVIII.A, because that plan and provision governed only *plaintiffs-appellees'* options. Thus, in its letter, AT & T never admitted that *Section XVIII.A* proscribed Wireless from

cashing out plaintiffs-appellees' options or that *Section XVIII.A* required Wireless to compensate plaintiffs-appellees for the lost time value of their options following a cash out merger.

Nor did AT & T ever admit in its answer that Section XVIII.A preserved the time value of plaintiffs-appellees' options. In paragraph 17 of their complaint, plaintiffs-appellees specifically alleged an interpretation of Section XVIII.A that an equivalent option must be granted in any merger. AT & T denied that allegation. AT & T initially made certain admissions that the options maintained value. However, these admissions are consistent with AT & T's theory that all options holders were protected under the Employee Benefits Agreement and the Wireless Adjustment Plan. Thus, any admissions that AT & T made about the value of the options did not relate to an interpretation of Section XVIII.A, but, rather, related to the Employee Benefits Agreement and the Wireless Adjustment Plan.

 Further, the Vice Chancellor correctly ruled that AT & T made no judicial admissions in its answer. When AT & T moved to amend its pleadings,

later issue options, which would not be governed by the Wireless Adjustment Plan or the Employee Benefits Agreement.

**44.** Plaintiffs-appellees' brief states that "AT & T ensured that plaintiffs' options 'were governed by the same terms and conditions, [*the 1994 plan*] and, (iv) were not subject to cancellation prior to the expiration of their original term.'" (emphasis added). Plaintiffs-appellees purport to quote AT & T's letter to plaintiffs-appellees' counsel. In fact, however, the text of the letter reads:

AT & T took all reasonably available steps as part of the split-off to ensure that *all* Adjusted Options, as compared to the 'T' options they replaced, (i) had the same intrinsic value, (ii) were exercisable over the same term, (iii) were governed by the same terms and conditions, and (iv) were not

subject to cancellation prior to the expiration of their original term. The *Employee Benefits Agreement* and the *Adjustment Plan* (i) prevent Wireless from canceling the Adjusted Options prior to expiration, and (ii) require Wireless, in the event of any merger, to make such adjustments and other substitutions to the Adjusted Options as shall protect your clients' 'economic rights' in their options.

(emphasis added). We find absolutely *no* support for plaintiffs-appellees' bracketed language when they quoted this letter in their brief. This letter never mentions the 1994 plan. Instead, it refers to (1) Adjusted Options, which as we describe in footnote 43 is a defined term in the Wireless Adjustment Plan, and (2) the Employee Benefits Agreement and the Adjustment Plan.

plaintiffs-appellees countered that AT & T's admissions represented binding judicial admissions.[45] The Vice Chancellor allowed AT & T to amend its answer, noting that AT & T was amending its answer to change conclusions of law, and not of fact. In his opinion, he wrote that,

> judicial admissions apply only to admissions of fact, not to theories of law, such as contract interpretation. Moreover, AT & T is not barred from changing its position under the doctrine of judicial estoppel because this court did not rely on AT & T's argument in a decision.[46]

The Vice Chancellor correctly stated the law when he concluded that AT & T's conclusions of law were not judicial admissions:

> The scope of a judicial admission by counsel is restricted to unequivocal statements as to matters of fact which otherwise would not require evidentiary proof; it does not extend to counsel's statement of his conception of the legal theory of a case, i.e., legal opinion or conclusion.[47]

Plaintiffs-appellees, on appeal, claim that AT & T's withdrawn answer may still be considered as evidence. Plaintiffs-appellees quote *Bruce E.M. v. Dorothea A.M.* for the proposition that a party's withdrawn legal conclusion may be considered evidence, "the averments of a party in one action, as well as pleadings which have been superseded by amendment, withdrawn, or dismissed, may be taken as admissions against the interest of the pleading party with respect to the facts alleged therein." [48]

Trial judges may consider amended pleadings as evidence in certain circumstances:

> Under some circumstances, a party may offer earlier versions of its opponent's pleadings as evidence of the facts therein, but they are not judicial admissions, and the amending party may offer evidence to rebut its superseded allegations.[49]

But here, the Vice Chancellor correctly decided that AT & T's admissions were conclusions of law and as such not binding. More importantly AT & T's factual admissions, if any, related only to the Employee Benefits Agreement and the Wireless Adjustment Plan, but not to the 1994 MediaOne plan. Therefore, the Vice Chancellor should afford no weight to AT & T's supposed admissions when interpreting Section XVIII.A on remand.

### CONCLUSION

NOW, THEREFORE, IT IS ORDERED that the judgment of the Court of Chancery is **REMANDED** for proceedings consistent with this opinion. The Court of Chancery should file its opinion upon remand within sixty days. Jurisdiction is retained.[50]

---

45. *Lillis,* 896 A.2d at 877.

46. *Id.*

47. Michael Graham, Handbook of Federal Evidence, 801:26 at 906 (6th ed. 2006).

48. 455 A.2d 866, 869 (Del.1983).

49. *188 LLC v. Trinity Indus. Inc.,* 300 F.3d 730, 736 (7th Cir.2002).

50. Sup.Ct. R. 19(c).