# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| BLUE REHOBOTH MARINA, LLC, | : | C.A. No.: S21C-08-033 CAK |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| MARINA VIEW CONDOMINIUM ASSOCIATION OF UNIT OWNERS, | : |  |
|  | : |  |
| Defendant. | : |  |

Submitted: August 14, 2023

Decided: August 22, 2023

## DECISION AFTER TRIAL

Stephen A. Spence, Esquire. Meluney Alleman & Spence, LLC, 1143 Savannah Road, Suite 3-A, Lewes, Delaware, 19958, Attorney for Plaintiff/Counterclaim Defendant.

Peter K. Schaeffer, Jr., Esquire, Avenue Law, 1073 South Governors Avenue, Dover, Delaware 19904, Attorney for Defendant.

**KARSNITZ, R. J**.

Value is in the eyes of the beholder.  This case is a dispute over thirteen parking spaces in the Town of Dewey Beach.  Dewey is such a popular beach destination it carries its own motto – A Way of Life.  Dewey is such a desired summer playground that its limited space becomes saturated.  One result of our ubiquitous use of motor vehicles is that parking becomes precious.  This litigation combined these features with a development in a space smaller than what the users of the space would have preferred.

The Rehoboth Marina development consisted of approximately 200 boat slips with related amenities.  Those amenities included boardwalks, dock space and a marina store.  The development also had a hotel.  One hundred and forty-nine parking spaces serviced the uses.  In the early part of the 21st century the owners of the marina development decided to renovate the hotel buildings, subject the property to a condominium regime, and then market the condominium units.  The owners of the property intended to retain ownership of and continue to operate the marina.

Two of the principals in the marina project were Chris Redefer and William Galbraith.  The latter testified at the two-day bench trial I held on April 17 and 18, 2023.  The former did not.  The parties discussed Mr. Redefer and his actions and conduct repeatedly and often in unkind terms.  Mr. Redefer served as dockmaster for the marina and property manager for the condominium until 2015 when the

association discharged him. He continued on as dockmaster until Mr. Galbraith purchased Mr. Redefer's interest in the project in 2020.

Mr. Galbraith, a professional engineer licensed in a number of states including Delaware, took the lead in the effort to refurbish the hotel to prepare it for conversion to condominiums. He worked with, *inter alia*, the surveyor who prepared some of the documents for the Condominium Declaration Plan,[1] as well as the architect who prepared the detailed plans for the work on what would become condominium buildings 1 and 2. Mr. Galbraith's testimony, which I found to be credible, showed he was the engineering design force behind the project. He testified he was careful to consult his partners, but for the most part they relied upon him to move the development to conclusion.

To effectuate the plan, Mr. Galbraith and his partners utilized several business entities. Marina Motel Ventures, LLC created the condominium regime which eventually became the Marina View Condominium Association of Unit Owners. Marina Motel Ventures, LLC owned the land and subaqueous rights that encompassed the condominium and the marina. It leased the marina and related areas as described to Rehoboth Marina Ventures, LLC in a recorded lease dated July 25, 2006.

---

[1] 25 *Del. C.* §2220.

At the same time, Marina Motel Ventures, LLC, primarily through Mr. Galbraith, helped take the land through the condominium process. To do so, Mr. Galbraith and his partners created an Original Declaration Plan and First Amendment to the Declaration Plan. The former was recorded with appropriate authorities on July 26, 2006, and the latter on September 7, 2006. The Declaration Plan consisted of a cover page, and a page labelled C.1.1, which consisted of a formal survey of the property, and other details. The Plan also consisted of pages labelled A-1.1 through A-1.4, and pages A-2.1 and A-2.2. The "A" pages were prepared by an architect and included many architectural details for Building 1, located at the southern end of the property.

The First Amendment to the Plan included the same cover, and C-1.1 page, but a set of "A" pages which showed architectural detail for Building 2, located in the northwest section of the property. As I will later describe, the Marina View Condominium Association put significant weight in support of its arguments on the internal dates on the C-1.1 documents, dated July 25, 2006, and the internal date on the "A" documents, dated July 14, 2006.

Principals in all the entities were originally the same. They included Joseph J. Corrado, Jr., Chris R. Redefer and William Galbraith. In achieving this goal of separating the marina from the motel, and in turning the motel into condominium units, the principals stood on both (all) sides of the transactions. The owners created

the world of the Rehoboth Bay Marina, and the Marina View Condominiums, and determined the rights for future owners. It is commonplace and perhaps ubiquitous for the original owners of property subject to condominium conversion to stand on both sides of a transaction. In this case, because of the disputes between the parties, I must decide what the original owners intended to create.

The lease between Marina Motel Ventures, LLC and Blue Rehoboth Marina, LLC (formerly Rehoboth Marina Ventures, LLC) recited that the lessor intended to subject its property to the Delaware Unit Property Act (the condominium creation law).[2] The lease also referenced the Marina View Condominium Declaration Plan for its designation of the areas leased to Blue Rehoboth Marina, LLC (formerly Rehoboth Marina Ventures, LLC). Paragraph 1 of the lease reads in pertinent part:

> Description of Premises. The leased premises shall consist of the following:
>
> (a) Those portions of the Common Elements of the Condominium, as depicted upon the Marina View Condominium Declaration Plan, including: the Marina Building and adjacent parking/storage area on the north side; the boat ramp area; the fuel tank and storage area; the fuel pump areas; the ice machine/vending area; the pump-out station; wooden walkways adjacent to piers over subaqueous lands; utility areas at the northwest and southwest corners of the Property; the sign area on the northeast corner of Tract 2 of the Property; an office/storage area on the second floor of the Marina View Condominium; and other areas specifically designated as "Marina Area" among the aforesaid Declaration Plan; and

---

[2] 25 *Del. C.* §2201 *et seq.*

> (b) Those portions of the Common Elements of Marina View Condominium, as depicted upon the Marina View Condominium Declaration Plan, parking areas designated as "Marina Area."
>
> The leased premises shall hereinafter be referred to as the "Leased Property."

The difficulty with the lease designation of the leased property is there are inconsistencies between the designation of parking areas allocated to the marina and those allocated to the condominiums. Specifically, there are differences between what is shown on document C-1.1, and document A-1.1 as to the parking space allocation.[3]

The primary question in this case is which document, as between C-1.1 and A-1.1, controls the allocation of parking spaces. The disputants are the marina entity lessee and the condominium association, which succeeded in interest to the original lessor.

**PROCEDURAL BACKGROUND**

I held a two-day bench trial on April 17 and 18, 2023. At the end of the trial, I gave the parties 30 days after receipt of the trial transcript to submit their opening post-trial briefs, and 15 days thereafter to file their answering post-trial briefs.

---

[3] The other "A" documents deal with upper floors of the building and do not show the ground floor parking. They have no bearing on this dispute.

On May 15, 2023, the Plaintiff, Rehoboth Marina Ventures, LLC assigned, transferred, and conveyed, among other things, all of its right, title, and interest in the lease, the Marina, and the claims and defenses asserted in this action, to Blue Rehoboth Marina, LLC. The caption of this case was correspondingly changed.

On June 7, 2023, the parties filed a stipulation that they would file their opening post-trial briefs on July 15 and their answering post-trial briefs on August 14, 2023. On June 28, 2023, I denied a modification of the stipulation which would have extended these dates.

Both parties filed their post-trial opening briefs on July 14, 2023, and their post-trial answering briefs on August 14, 2023. This is my decision on the merits.

**THE PARKING SPACES AT ISSUE**

There are disputes over 13 spaces in groupings of 4 spaces, 5 spaces, 3 spaces and 1 space.

The four space issue involves four spaces on the southwestern edge of the property, two under the western edge of Building 1, and two just outside the western edge. These spaces have traditionally served the marina and have done so from the creation of Rehoboth Marina View Condominiums, and the Rehoboth Marina lease arrangement, until 2020. In 2020 the Condominium Association gave notice to all it would be repainting the parking area. When it repainted, the Condominium

Association eliminated one of the four parking spaces and designated the other three for handicapped parking. The Association raised a factual issue as to whether the Marina approved the reworking of these spaces. The evidence was slim on this issue. To the extent the Association is claiming waiver of the Marina's rights under the lease, I find insufficient factual support and no writing consistent with the lease requirements.

The Association also argued that applicable law required the handicapped spaces, and the two spaces allocable to the Marina (by the C-1.1 document) could be used by the Marina as handicapped spaces. However, the Association has no right under the lease to dictate how the Marina uses its spaces. The argument that it does is specious, and I reject it. For the same reason I reject the Association's argument it could eliminate one space because an electric meter box exists at the space's southern end, and people parking in the space keep running into the box.

The only remaining issue for the four spaces is the central one of which drawing controls. I will address this issue after I finish addressing the facts concerning the other groupings of parking spaces.

The five spaces are partially under Building 2. They abut the walkway and bulkhead at the northeast section of the property. Drawing C-1.1 does not show these five spaces. Drawing A-1.1 does, and allocates them to the Marina. One might

conclude that the C-1.1 drawing does not show these spots because they are largely under Building 2 and cannot be seen. The only issue with these spots is the conflict between the two drawings.

The three parking spots are, perhaps, the most problematic. These spots are just south of Building 2, next to the Rehoboth Bay, and generally just to the west of the Marina building. They are convenient drop off spots for both the Marina and Building 2, and constituents of both parties used them from the creation of this world until around 2015. In 2015 a dispute arose between Mr. Redefer and the Condominium Association. At the time Mr. Redefer was both dockmaster for the Marina, and property manager for the Condominium Association. The Association fired him, and in what the Association representatives described as a fit of anger, the day after his firing he repainted the three spaces for use by the Marina. I never heard Mr. Redefer's explanation of what happened. Despite the remarking of these spots, Condominium Association members and guests and Marina constituents continued to use the three spaces as they had before the repainting.

Document C-1.1 shows these spots as common elements. Document A-1.1 marks them for use by the Marina. A determination of the three spots' proper allocation depends upon the determination of the controlling document.

Finally, one spot, on the north side of the area set aside for the Marina building, has been used by the Marina manager. Again, this is marked as part of the common elements on C-1.1, and for Marina use on A-1.1.

## THE DOCUMENTS AND EXPERT TESTIMONY

As I have described, the documents are inconsistent as to the parking spaces at issue. I look to several sources for guidance. If the documents give specific guidance on the issue they control.[4] If they are not clear, I attempt to divine the intent of the preparers.[5] As to both issues, I consider both the lay testimony and the expert opinions offered at trial.

## THE DOCUMENTS

C-1.1 is an overview of the property and a formal survey. It is a document required by the Unit Property Act.[6] Counsel for Plaintiff described it accurately as the 10,000 foot view. It contains many details. To further confuse matters, the plans contain a C-1.1 in the original plans, as well as a separate one in the First Amended Plans, although the internal markings show the same date, July 25, 2006. As best I can tell, the difference between the two C-1.1 plans is that the one in the First Amended Declaration contained details of Building 2, not shown on the original

---

[4] *Travis v. Escape Hosp.*, 2020 WL 1170768, at *3 (Del. Super. Feb. 28, 2020) (footnotes omitted).
[5] *AT&T Corp. v. Lillis*, 953 A.2d 241, 253 (Del. 2008); *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003).
[6] 25 *Del. C.* §2220.

Declaration Plan. No testimony pointed out any other difference, and my untrained eye has discerned none. No testimony explained why these separate documents would contain the same preparation date. The parties make no issue of this, so I make no issue of it.[7]

C-1.1 has one note central to the issue. It has what the parties described as a "call out". The Call Out says:

> See **Floor Plans** for Parking Spaces, Stairwells, Mechanical Areas, Community Room, Office Areas, Etc. (Bold in the original)

"Floor Plans" means A-1.1, so the Call Out is telling.

**THE EXPERT TESTIMONY**

The Defendant presented two expert reports and expert witness' trial testimony. David Naples is a principal in Code Solutions International, LLC with an address in Harbeson, Delaware. Mr. Naples is superbly qualified in all things related to building or other municipal codes. He opines in his report that all the parking spaces at issue belong to the Condominium Association. Nowhere in his report does he tell me why he reaches these conclusions. I infer that he does so

---

[7] One of defendant's experts, David Naples, in his written report opined that the First Amended Plans would be controlling. However, he never said in either his testimony or in his report any differences he may have found between the original and first amended plans that bore upon the issue of which document controlled parking space allocation.

11

because he considers the C-1.1 documents as controlling, because they are internally dated later than the A-1.1 documents. I also infer this because the Defendant's other expert, Thomas G. Wilkes, says that the internal date which is the latest – the one in the C-1.1 documents -- controls. It appears to me Mr. Naples simply piggy backed off Mr. Wilkes and then accurately read C-1.1.

I found Mr. Naples' opinions unhelpful. His qualifications are not on point as to the issues raised. His report is conclusory. He did at trial try to buttress his opinions by referencing document C-1.1's quality as a survey. From this he concluded that C-1.1 controls. I have two problems with this opinion. First, it was not disclosed prior to trial, and Plaintiff's counsel properly objected to it. Even were I to consider it, I found no reason to use the quality of a survey as creating an order of merit which would raise document C-1.1 over document A-1.1.

Mr. Wilkes is a professional Civil Engineer licensed in a number of States, including Delaware. He is well qualified to address and give opinions concerning the proper reading of drawings. He too gave opinions at trial that were not stated in his report. Plaintiff's counsel rightly objected. I will, however, address all his opinions.

His report, as noted, gave the later date of the C-1.1 documents as the reason to rely upon them and not A-1.1.[8] The reliance upon the internal date for me is not controlling, for a number of reasons. The date appears to me internal only, and not any determination as to which document controls. Plaintiff's expert, Matthew Burns, P.E., testified to this, and I found his testimony credible, and consistent with their drafting. In addition, the documents were part of a comprehensive plan for the construction of the project and its submission under the Unit Property Act. Mr. Galbraith and the creators of the documents recorded The Declaration Plan, with both C-1.1 and A-1.1 Documents, together as one package. They did the same with the First Amended Declaration Plan, and its version of C-1.1 and A-1.1. This shows me that the creators of the plans never intended that they were separate or independent documents. I reject the "separate dates" argument.

Mr. Wilkes also at trial espoused the "a survey gets additional credence" argument. I reject this for the same reasons I rejected the same argument made by Mr. Naples. Also, it was not in Mr. Wilkes' report.

Two final comments about Mr. Wilkes. First, he only discussed four parking spaces "…near the Marina building." These would be the "three spaces" and the "manager's space" as I have labelled them. He does not address the others. I can

---

[8] See Wilkes report, Defendant's Ex. 2, Tab D.

only find expert evidence to the other spaces by piecing together Mr. Wilkes' "date theory" with Mr. Naples' unsubstantiated opinions. I decline to do this.

Second, I asked Mr. Wilkes if I should simply ignore the "call out" language of document C-1.1 in making my determination of which document controls. Tellingly, he told me I should not ignore the "call out." Stated affirmatively, his view was I had to consider the "call out" language when making the decision as to which document controls.

## THE "CALL OUT" AND THE TESTIMONY OF MR. GALBRAITH

For me, the "call out" language controls this case. It is an express direction to look to document A-1.1 for determining parking spaces. The language could not be more direct and clear, and the law requires me to give effect to the clear language.[9]

To the extent necessary Mr. Galbraith's testimony buttressed the specific language. Mr. Galbraith was intimately involved with the process of creating the condominiums and the Marina, including the lease. He told me he determined (and cleared with his partners), an allocation of 50 parking space to the Marina, and 99 to the condominiums. I found Mr. Galbraith's testimony credible and logical. That

---

[9] *Travis v. Escape Hosp.*, 2020 WL 1170768, at *3 (Del. Super. Feb. 28, 2020) (footnotes omitted).

allocation was set forth in Documents A-1.1 and it is the controlling document. I believe ultimately Mr. Wilkes agreed.

I grant judgment in favor of the Plaintiff and against the Defendant as to all parking spaces at issue.

**DAMAGES**

"A tenant may sue the landlord for damages resulting from the landlord's breach of his duties under a lease."[10] "The appropriate measure of damages in a breach of contract action is that amount which will return the damaged parties to the position they would have been in had the breach not occurred. Those damages include those which might have been foreseen or anticipated as being likely to flow from the breach."[11] In my view, Plaintiff has showed that Defendant breached the Lease and caused Plaintiff damages. Defendant unilaterally eliminated one of the Four Spaces and redesignated the other three spaces as handicapped parking only. Defendant made those changes without advance notice to, or the prior consent of, Plaintiff. Defendant conceded two of the Four Spaces were always Plaintiff's to control. Moreover, two of the Four Spaces were also allocated to Plaintiff. Although Defendant did not actively exclude Plaintiff's customers from the Four Spaces, it eliminated one space and redesignated the other three spaces as handicapped parking

---

[10] *Brown v. Robyn Realty Co.*, 367 A.2d 183, 189 (Del. Super. 1976).
[11] *Gerstley v. Mayer*, 2015 WL 756981, at *5 (Del. Super. Feb. 11, 2015).

only, negatively impacting Plaintiff's parking rights under the Lease. Plaintiff demonstrated that it spent $1,800 for additional public parking passes to make up for the four spaces to which it no longer had full access. For breach of the Lease, I award Plaintiff $1,800 in damages, as well as pre- and post-judgment interest of those damages.

## LEGAL FEES AND COSTS

Plaintiff concedes that it cannot seek an award of its legal fees under the Lease's fee-shifting provision because that provision runs only in favor of Defendant.[12] However, Plaintiff nonetheless seeks to recover a portion of its legal fees and costs under the bad-faith exception to the American Rule that each party bears its own legal fees and costs. It argues that Defendant's claim with respect to the Five Spaces which Plaintiff had used for decades (the "Five Spaces Claim") should never have been pursued. I allowed the addition of the Five Spaces Claim by amendment at the end of the discovery period after the motion to amend deadline had passed. Plaintiff defended the Five Spaces Claim against Defendant's motion for summary judgment. Defendant included the Five Spaces Claim in the Pre-Trial Stipulation. However, neither the written reports nor the testimony at trial of

---

[12] Pl. Ex. 1, Tab 1 ¶20.

Defendant's experts supported the Five Spaces Claim. Indeed, at trial, Defendant quickly capitulated on the Five Spaces Claim.[13]

Delaware Courts have found bad faith where parties have unnecessarily prolonged or delayed litigation, knowingly asserted frivolous claims, misled the court, or changed position on an issue.[14] Plaintiff argues that Defendant did *all* those things: delayed the case, filed a frivolous claim, misled me, and changed position on an issue. The facts suggest that there was a delay in the proceedings, but not necessarily that the delay was exclusively or primarily due to the Five Spaces Claim. Defendant did change its position on the Five Spaces Claim at the last minute. But the facts do not suggest to me that Defendant intentionally delayed the case, knowingly asserted a frivolous claim, or deliberately misled me. I do not disagree that Plaintiff incurred additional legal fees and expenses defending against the Five Spaces Claim in its pleadings, motions, expert preparation, and trial preparation. However, in my mind Defendant's conduct, while it might have been better, does not rise to the standard set out in Delaware law to require Defendant to pay Plaintiff's legal fees and costs associated with the defense of the Five Spaces Claim.

I deny this claim.

---

[13] Tr. A 214-215 (Naples), Tr. A 243 (Wilkes).
[14] See *RBC Capital Markets, LLC v. Jervis*, 129 A.3d 816, 877 (Del. 2015) (stating standard).

## CONCLUSION

It is unfortunate that the parties litigated these issues to the degree they did. The Blue Rehoboth Marina and the Marina View Condominiums live in a world of tight quarters. There was never going to be enough parking for the intended uses. The plans set in place an area rife for conflict. The testimony of the Condominium Association representatives showed they felt misled from the time of the purchase of their units. But that is not the issue before me, and is long in the past.

Plaintiff's counsel is directed to submit an Order consistent with and effectuating this Opinion. The Order shall be submitted to counsel for Defendant for review as to form.

/s/ Craig A. Karsnitz

cc:     Prothonotary